UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SHAWN WILLIAMS,

               Plaintiff,

  – against –

LOUIS SCARCELLA, STEVEN CHMIL,
LEWIS BOND, JOHN AND JANE DOES 1-
10 and THE CITY OF NEW YORK,

             Defendants.

Case No. 20-CV-_____

**<u>COMPLAINT</u>**

JURY TRIAL DEMANDED

WHITE & CASE LLP
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020411
(212) 819-8200

Kevin M. Bolan
(*pro hac vice* application to be filed)
75 State Street
Boston, Massachusetts 02109
(617) 979-9300

DAVID B. SHANIES LAW OFFICE LLC
David B. Shanies
Joel A. Wertheimer
Lafayette Street, Sixth Floor
New York, New York 10003
(212) 951-1710

Plaintiff Shawn Williams, by his undersigned *pro bono* counsel White & Case LLP and co-counsel David B. Shanies, as and for his complaint against the above-named defendants, alleges as follows:

## INTRODUCTION

1.     In 1994, Shawn Williams was falsely convicted of the murder of Marvin Mason based solely on the testimony of a single eye-witness, who claimed to have recognized Mr. Williams from approximately 100 feet away, from her sixth-story window, at midnight.  Twenty years later, in a sworn affidavit, that sole eye-witness, Margaret Smith, recanted her testimony.  Ms. Smith now admits that she did not, in fact, see Mr. Williams fleeing the crime scene, and that she testified falsely due to coercion by former NYPD detectives Louis Scarcella, Stephen Chmil, and Lewis Bond — the first two of whom have since been implicated in a series of highly publicized, similar wrongful convictions.  Indeed, Ms. Smith could not have seen Mr. Williams the night of Marvin Mason's murder, because Mr. Williams was in Reading, Pennsylvania.

2.     Following Ms. Smith's recantation, Mr. Williams spent over four years lobbying and litigating with the Kings County District Attorney's Office (the "KCDA").  Ultimately, Mr. Williams was forced to file a motion under N.Y. C.P.L. § 440.10 to vacate his conviction on the grounds of actual innocence; newly discovered evidence; and violations of his Fifth and Fourteenth Amendment rights, including *Brady* violations.  The KCDA opposed the motion.

3.     Finally, in July 2018, the KCDA relented and dropped its opposition to Mr. Williams's § 440 motion.  Mr. Williams was released on July 13, 2018, having served almost 24 years in prison for a crime he did not commit.

4.      The facts and circumstances surrounding Ms. Smith's false trial testimony reveal misconduct reaching from the investigating detectives to the prosecutors at trial.  After being pressured to falsely identify Mr. Williams, Ms. Smith left New York for Georgia, in part because she did not want to continue to participate in what she knew to be a false prosecution.  During Mr. Williams's trial, the KCDA obtained a material witness order for Ms. Smith.  Police officers came to Ms. Smith's home in Georgia, arrested her, imprisoned her, and transported her against her will to New York to serve as the People's sole witness against Mr. Williams at trial.  The material witness order and the circumstances under which Ms. Smith was made to testify were not disclosed to Mr. Williams's trial counsel.  Instead, the KCDA prosecutor, Lance Ogiste, described Ms. Smith to the jury as "spunky" for agreeing to "cooperate" with the prosecution — even though he knew Ms. Smith had been coerced to testify against her will.

5.      Mr. Williams is innocent.   Since his arrest in 1993 he has consistently offered the truth:  that he was in Reading, Pennsylvania at the time of Mr. Mason's murder.  Indeed, documentary evidence places Mr. Williams in Reading both a few days before and a few days after Mr. Mason was killed.  And no competent evidence, except for Ms. Smith's false identification, ever inculpated Mr. Williams in Mr. Mason's death.  Ms. Smith has now recanted her false identification, leaving no trial evidence to inculpate Mr. Williams.

6.      The following factors, among others, caused Mr. Williams's false conviction: the misconduct of NYPD Detectives Scarcella, Chmil, and Bond, and KCDA Assistant District Attorney Ogiste; the unlawful failure by the NYPD and KCDA to supervise these individuals or intervene to prevent their unlawful conduct; and the

misconduct, policies, customs, and practices of the NYPD and KCDA that persistently led to violations of the constitutional rights of criminal suspects and defendants, including Mr. Williams.  Mr. Williams seeks redress for the police and prosecutorial misconduct that caused him to spend almost 24 years in prison, and the mental and physical injuries he sustained in prison, as a result of his false and unlawfully procured conviction.

## NATURE OF THE ACTION

7.     This is an action to recover compensatory and punitive damages and an award of costs and attorneys' fees for violations of Mr. Williams's rights secured by 42 U.S.C. §§ 1983 and 1988 and by the United States Constitution, including its Fourth, Fifth, and Fourteenth Amendments, because of Defendants' manufacturing evidence to arrest and prosecute Mr. Williams for a crime he did not commit.  Specifically, the Detectives coerced Ms. Smith into giving a false statement and identification of Mr. Williams.  That coerced and false identification served as the sole ground for Mr. Williams's arrest, indictment, prosecution, conviction, and almost 24 years of wrongful incarceration.

8.     The lawsuit also seeks to hold defendant City of New York liable for the police and prosecutors' misconduct under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).  The NYPD and KCDA maintained unlawful policies, practices, and customs during Mr. William's investigation, arrest, and trial.  In executing these unlawful policies, practices, and customs, police and prosecutors violated the constitutional rights of criminal suspects and defendants, including Mr. Williams.  In Mr. Williams's case, the unlawful policies, practices, and customs enabled defendants Scarcella, Chmil, and Bond, as well as other members, servants, employees, and agents of the NYPD and KCDA, to violate Mr. Williams's constitutional rights.  The policy-making officials acting on behalf

of the City of New York were deliberately indifferent to these unlawful policies, practices, and customs.  As a result, the City of New York is liable for Mr. William's injury.

## JURISDICTION AND VENUE

9.     This action is brought under 42 U.S.C. §§ 1983 and 1988 in that Mr. Williams alleges that he was deprived under color of law of his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution because of the coercion of a false identification against him; the fabrication of evidence, specifically, the false statements of Ms. Smith before the grand jury and at trial; Mr. Williams's arrest and prosecution in the absence of probable cause; the suppression of *Brady* information, and related false and misleading statements made in summation.

10.     This Court has original subject matter jurisdiction over Mr. Williams's federal law claims under 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress for the violation of Mr. Williams's constitutional and civil rights.

11.     Venue is proper in the United States District Court for the Eastern District of New York under 28 U.S.C. § 1391 because Mr. Williams's claims arose in this District.

## CONDITIONS PRECEDENT

12.     Mr. Williams has complied with all conditions precedent to the commencement of this action, having timely served on October 5, 2018 a notice of claim upon the Comptroller of the City of New York, under Section 50-i of the New York General Municipal Law; having waited more than 30 days since said service, without these claims having been settled or otherwise resolved; having had a hearing under section 50-h of the New York General Municipal Law on December 14, 2018; and having brought this action in a timely manner.

## PARTIES

13.     Plaintiff Shawn Williams is a citizen of the United States and was, at all times relevant to this action, a resident of the County of Kings, in the City and State of New York.  He was born and currently resides in Brooklyn, New York.

14.     Defendant City of New York is and was at all relevant times a municipal corporation existing under and by virtue of the laws of the City and the State of New York, and having the powers and duties imposed by law thereon.

15.     The NYPD and the KCDA are and were at all relevant times agencies of Defendant City of New York.  At all times relevant to this action, Defendant City of New York, by its agents, servants, and employees was responsible for the operation, maintenance, and control of the NYPD and the KCDA, and the selection, training, supervision, and disciplining of police officers and prosecutors.

16.     At all relevant times, the Kings County District Attorney (the "District Attorney"), including Charles Hynes, was and is an elected officer of Kings County responsible for the KCDA, an agency funded by Defendant City of New York.

17.     The KCDA and its authorized delegates at all relevant times had final authority, and constituted policymakers for the City of New York and for whom the City of New York is liable, with respect to the hiring, management, training, supervision, and discipline of personnel employed by or assigned to the KCDA.

18.     The District Attorney was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2.

19.     The State of New York has provided by statute that Defendant City of New York's constituent counties—including Kings County—and hence Defendant City of New York itself, is liable for torts committed by County officers and employees, such

as the District Attorney and Kings County Assistant District Attorneys ("ADAs"), and other employees of the KCDA. *See* N.Y. County Law §§ 53, 941.

20.     Defendant City of New York was at all times relevant the public employer of Defendants Louis Scarcella, Steven Chmil, Lewis Bond, and Jane and John Does Nos. 1 through 10, and legally responsible for torts they committed within the scope of their employment or under color of law. Defendant City of New York is also obligated under law and by contract to indemnify and defend the individual defendants named herein.

21.     Defendant Louis Scarcella is a retired officer of the NYPD. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant City of New York, holding the rank of Detective, Second-Grade from March 25, 1988 until December 23, 1993, and the rank of Detective, First-Grade thereafter, until his retirement on March 25, 1999. At all relevant times, Defendant Scarcella acted toward Mr. Williams under color of law, and in his individual capacity within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New York. This lawsuit seeks to hold Defendant Louis Scarcella liable in his individual capacity.

22.     In light of Defendant Scarcella's well-documented abuses, in or around 2013, the KCDA ordered the review of more than 50 cases where Scarcella played an important role. By 2016, that number had grown to 72. To date, at least 14 homicide convictions have been vacated in those cases, including Mr. Williams's. Moreover, in addition to Mr. Williams's conviction, at least eight convictions—those of John Bunn, Rosean Hargrove, David Ranta, Derrick Hamilton, Roger Logan, Robert Hill, Alvenna Jennette, Darryl Austin—have been vacated because Defendant Scarcella tainted line-up

identifications or coerced individuals to testify as eyewitnesses to events that they had not, in fact, witnessed.

23.     Defendant Steven Chmil is a retired officer of the NYPD who served as Defendant Scarcella's longtime partner, including during the investigation and prosecution of Mr. Williams.  At all relevant times, he was an officer of the NYPD, employed by Defendant City of New York, with the rank of Detective.  At all relevant times, Defendant Chmil acted toward Mr. Williams under color of law, and in his individual capacity within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New York. This lawsuit seeks to hold Defendant Steven Chmil liable in his individual capacity.

24.     Defendant Lewis Bond is a retired officer of the NYPD.  At all relevant times, he was an officer of the NYPD, employed by Defendant City of New York, with the rank of Detective.  At all relevant times herein, Defendant Bond acted toward Mr. Williams under color of law, and in his individual capacity within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Lewis Bond liable in his individual capacity.

25.     Defendants Jane and John Does 1 through 10 are supervisors in the NYPD acting toward Mr. Williams under color of law and in their individual capacities within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New York, who participated in the misconduct alleged herein but whose actual names Mr. Williams has been unable to

ascertain notwithstanding reasonable efforts to do so.   This lawsuit seeks to hold Defendants Jane and John Does 1 through 10 liable in their individual capacities

## JURY DEMAND

26.     Mr. Williams hereby demands trial by jury of all issues raised in this complaint.

## FACTS

### A.     The False Facts As Presented by the Prosecution

27.     Just after midnight on July 9, 1993, Police Officers John Salerno and Brady O'Neil responded to shots fired at 1245 Eastern Parkway in Brooklyn.   Trial Tr. 218:20-25.   They found a man lying face-down in front of the elevator in the building lobby, his knapsack open and his wallet on the floor.   *Id.* at 219:14-15, 220:3-8.   The deceased was later identified as Marvin Mason.   *Id.* at 210:17-18.   The Crime Scene Unit responded to the scene as police questioned witnesses.   *Id.* at 221:10-19.   Several eyewitnesses reported seeing two men flee the building.   None could make an identification.   *Id.* at 275:13-15, 255:12, 273:21-25.

28.     Detectives Scarcella and Chmil arrived at 9:00 a.m. to investigate. *Id.* at 339:9.   The victim's brother, Christopher Mason, informed them that he had "made inquiries" in the neighborhood about the potential identity of the person responsible for the shooting and provided Chmil with the name "Murdock" (Mr. Williams's then-nickname). Pre-Trial Hr'g Tr. 30:8-24, 43:7-11.   While speaking to the Masons in their apartment, Chmil saw Margaret Smith, one of the Masons' neighbors.   Trial Tr. 413:13-21.   She was in the apartment only briefly and she did not indicate that she had any information regarding Marvin Mason's death.   *Id.* at 413:22-25, 399:7-9.

29.     Based on the information provided by Christopher Mason, the detectives obtained a photograph of Mr. Williams and placed it in a photo array.  Trial Tr. 400:15-24.  Later that evening, they visited Ms. Smith, who told them that she had seen two black men running from 1245 Eastern Parkway around the time of Marvin Mason's death.  Trial Tr. 415:17-24.  She could not identify the two individuals and did not mention the name "Murdock."  *Id.* at 414:4-9.  When shown the photo array, Ms. Smith stated that she could not identify the two individuals but that she knew Mr. Williams from the neighborhood.  *Id.* at 418:7-14.

30.     Scarcella, Chmil, and Bond returned to re-interview Ms. Smith on July 27—over two weeks later.  Trial Tr. 432:13-18.  Chmil testified that during this second interview, Ms. Smith independently changed her earlier statement and claimed that she had seen Mr. Williams "running out of the building after the shot with a gun."  *Id.* at 433-4-7.

31.     In addition to showing Ms. Smith the photo array with Mr. Williams's picture, Trial Tr. 358:24-359:6, on October 1, 1993, Scarcella, Chmil, and Bond took Ms. Smith to a lineup that included Mr. Williams.  Trial Tr. 295:3-296-6.  At trial, she was shown a photograph of the lineup and affirmed that it was the one she saw with the detectives.  *Id.* at 297:7-298:8.

32.     As a result of Ms. Smith's statements to the police, Mr. Williams was arrested on October 1, 1993.  Trial Tr. at 403:4-8.

33.     At the grand jury hearing, Ms. Smith identified Mr. Williams and testified that she saw Mr. Williams fleeing the murder scene with a gun.  *See* Smith Grand Jury Hr'g Tr. 5:20-6:3.

34.     At the trial, Ms. Smith testified that on the night of the murder, she was "sitting on [her] windowsill in [her] bedroom" talking on the phone. *Id.* at 282:17-18; 283:8-13.  After hearing a gunshot, she looked out the window of her sixth-story apartment, and saw two men running out of the building, one of whom was "sticking the gun in his waist." *Id.* at 285:5-11.  Ms. Smith testified that she was able to identify Mr. Williams as he fled from 1245 Eastern Parkway.  Trial Tr. 286:2-4.  When he crossed the street and looked back "under the lamppost," Ms. Smith testified, she "was quite sure who it was." *Id.* at 288:23-289:4, 289:16-17.

35.     Notably, Ms. Smith's trial testimony contradicted Chmil's in several ways.  For example, Ms. Smith testified that she made this identification to the detectives upon their first visit.  *Id.* at 346:8-14.  She even testified that she was the person who had informed the detectives of "Murdock's" involvement in the murder.  *Id.* at 340:5.  Indeed, in contrast to Chmil's testimony, Ms. Smith testified that she, not Christopher Mason, told the police to "look for Murdock because that's who I saw running out the building."  Trial Tr. 341:6-7.  Ms. Smith testified she had "no doubt" she gave this information to Scarcella and Chmil at their first meeting.  *Id.* at 359:17.  These contradictions, which pertain to fundamental aspects of Ms. Smith's and Detective Chmil's testimony, evidenced at the time of trial that Ms. Smith's testimony was fabricated.

36.     The only other "eyewitness" to testify at trial was Vanessa Wagner. Ms. Wagner testified that she was sitting on a bench across the street from 1245 Eastern Parkway with her boyfriend at the time of the shooting and that she heard a loud noise and saw two black male teenagers running out of the building.  *Id.* at 249:21-250:7, 252:22, 256:10-257:3.  She did not make an identification.  *Id.* at 275:13-15, 255:12, 273:21-25.

37.    No DNA or forensic evidence was ever presented to connect Mr. Williams to Mr. Mason's murder.   No murder weapon was ever recovered.   No circumstantial evidence was ever presented.  No motive was ever advanced.

38.    As a result of Ms. Smith's testimony, on August 16, 1994, the jury returned a guilty verdict for murder in the second degree.  Trial Tr. 580:23-581:2.

39.    On September 8, 1994, Mr. Williams was sentenced to 25 years to life.  Sentencing Tr. 13:4-9.  His only statement to the sentencing court was that he was innocent.  *Id.* at 11:22-23.

40.    On direct appeal, the Appellate Division affirmed the judgment, *People v. Williams*, 227 A.D.2d (2d Dep't 1996), and a judge of the Court of Appeals denied leave to appeal.

**B.    The Truth of Mr. Williams's Conviction**

41.    The following evidence—much recently discovered and presented in Mr. Williams's § 440 motion—demonstrates the unlawful police work and prosecutorial misconduct that caused Mr. Williams's wrongful conviction.

1.    Ms. Smith's Sworn Recantation of Her Identification and Trial Testimony

42.    Ms. Smith, the sole witness to identify Mr. Williams at trial, has issued a sworn affidavit, recanting her trial testimony in full.

43.    Ms. Smith stated that "[a]t no time did [she] see the[] individuals' faces" leaving 1245 Eastern Parkway.  Exhibit 1, Smith Affidavit, ¶ 5.  Nor did she "see any of these individuals' physical characteristics."  *Id.*

44.    When the detectives came to Ms. Smith's home to show her the photo array, they "moved very quickly through the book of photographs until . . . [they]

stopped on a page, pointed to a particular photograph and asked [Ms. Smith] if [she] recognized [that] individual," whom they identified as "Murdock." *Id.* ¶ 9.

45.     Notably, "[t]he detectives did not stop on any other photograph or ask [her] about any of the other photographs." *Id.*

46.     Ms. Smith did not recognize Mr. Williams from the photo array, did not see him the night of the murder, and did not even know his name or any nickname he may have had. *Id.* Rather, it was "[t]he detectives [who] stated that [Mr. Williams] was the killer." *Id.* ¶ 10.

47.     Ms. Smith made the false identification of Mr. Williams because she "still felt pressured to do what [she] believed the detectives wanted [her] to do, not because [she] recognized Mr. Williams." *Id.* ¶ 13. Among other things, the detectives told Ms. Smith that they might turn to her son as a suspect if she did not provide them with one.

48.     Ms. Smith's identification of Mr. Williams from a lineup at the police precinct was also illegitimate. She chose Mr. Williams "because [she] recognized him as the same person [she] had chosen from the book of photographs," and she "made this identification because [she] felt pressured to do what [she] believed the detectives wanted [her] to do, not because [she] recognized Mr. Williams as one of the individuals" she saw the night of the murder. *Id.* ¶ 14. Thus, Ms. Smith recants both her false identification of Mr. Williams from the October 1, 1993 lineup, and the trial testimony describing that identification.

   2.   The Concealed Circumstances Under Which Ms. Smith Was
        Forced to Testify

49.     On November 5, 1993, Ms. Smith moved to Georgia. She moved in part to "avoid further involvement in this stressful situation and avoid future interactions

with the detectives in this case, who I believed were pressuring me to identify an individual whom I did not see as the person who shot Marvin Mason." Ex. 1 ¶ 15.

50.     At the time of trial, Ms. Smith was unwilling to testify.  KCDA prosecutors therefore obtained a material witness order, under which police came to Ms. Smith's home in Georgia and took her to a Georgia court, where she was "arrested . . . and put . . . in a jail." *Id.* ¶ 16; *see also* Exhibit 2, Smith Material Witness Order.  Ms. Smith was temporarily released, but then "officers came to [her] house and escorted [her], against [her] will, to New York by plane." Ex. 1 ¶ 16.

51.     This process "confused, upset and frightened" Ms. Smith, who believed "that [she] had to falsely testify" against Mr. Williams "in order for the detectives and the Assistant District Attorney to leave [her] alone." *Id.* ¶ 17.

52.     On July 27, 1993, the detectives took Ms. Smith to an interview with an ADA, where she "falsely told the [ADA] that [she] recognized . . . 'Murdock'" at the crime scene. *Id.* ¶ 13.  Ms. Smith made this statement because she felt pressured to do what the detectives wanted, not because she recognized Mr. Williams. *Id.*

53.     Neither the material witness order nor the fact that Ms. Smith was being held involuntarily in police custody at the time she testified was disclosed to the defense at trial.  The material witness order was also absent from the files the KCDA provided to Mr. Williams's post-conviction counsel during the Conviction Review Unit's re-investigation of Mr. Williams's conviction.  Indeed, only after counsel learned of the order from Ms. Smith and specifically requested it from the KCDA was the order provided. The KCDA has never explained this omission.

54.     Moreover, ADA Ogiste's summation at Mr. Williams's trial created the distinct—and false—impression that Ms. Smith testified of her own volition:

> To get up on the witness stand in front of everyone, a jury, in open Court so everyone can see your face, so he can see your face . . . . That's right. **She's a spunky woman. Yes, she is going to do the honorable thing by getting up in front of you and testifying** . . . . It's one thing, as I said, to get involved to a certain extent, and it's another thing to come here in open Court and point someone out. A whole other matter. **And what helped her to do that? Again, a few good things that were done by Marvin Mason. A few acts of kindness, as she said.** He watched her kids coming in the door. She knew him, so she was fond of him. That, plus the fact that she was moving. She said, I was getting out of this state. I was getting out. You add these things together. Her being able to move out adds to her feeling of safety, **her feeling that it's okay, I can cooperate.**

Trial Tr. 524:19 – 526:6 (emphasis added).

55.     Ogiste's statements—that Ms. Smith was "spunky" enough to "do the honorable thing by getting up in front of you and testifying"; that "what helped her to" decide to testify were her kind feelings toward Marvin Mason; and, most egregious, that she had decided "it's okay, I can cooperate"—are all materially false and misleading. These statements purposefully and deceptively hid the truth: that Ms. Smith was testifying while involuntarily in police custody under a material witness order, and she testified only under duress.

### 3.  Crime Scene Reconstruction and Expert Report Show the Impossibility of Smith's Trial Identification

56.     An expert evaluation of the scene of Ms. Smith's identification proves what Ms. Smith now admits—that her testimony was false.

57.     During post-conviction proceedings, Mr. Williams's counsel retained Dr. Geoffrey Loftus, a preeminent scholar in perception and memory,[1] to prepare

---

1       *See, e.g.*, Reinitz, M.T., Séguin, J.A., Peria, W. & Loftus, G.R., *Confidence-accuracy relations for faces and scenes: Roles of features and familiarity*, Psychonomic Bulletin & Review, 19, 1085-1096 (2012);

an expert report on the reliability of Ms. Smith's purported identification.  Dr. Loftus evaluated, among other things, the lighting conditions under which Ms. Smith purportedly saw the subjects, the distance that separated Ms. Smith from the subjects and the angle at which Ms. Smith viewed the subjects. Dr. Loftus concluded that Ms. Smith's testimony was implausible, fundamentally flawed, and scientifically unreliable.  *See* Exhibit 3, Loftus Report.

### 4.  Mr. Williams's Consistent, Corroborated Alibi

58.    Mr. Williams has consistently maintained his innocence since his arrest—a claim that is supported by a consistent alibi, corroborated by documentary evidence.

59.    On October 1, 1993, after his arrest, Mr. Williams told Scarcella that he was in Reading, Pennsylvania during Mr. Mason's murder.  Pretrial Hr'g Tr. 112:7-10, 132:24-25.  Mr. Williams stated "that he had gotten a summons from a cop up there for drinking beer in the street" on July 2.  *Id.* at 149:7-10, 186:24-25.  Mr. Williams told Scarcella that he had used a fake name when he received this summons.

60.    A police report from Reading, Pennsylvania states that a "Tony Williams" received a citation for drinking beer at the corner of Franklin St. and 7th St. on July 2, 1993—days before Mr. Mason's murder.  *See* Exhibit 4, Reading Citation.  Mr. Williams remembers this incident and admits to using the false name "Tony Williams." Indeed, this summons was for the exact same day, at the exact street corner, and for the exact offense that Mr. Williams had described.

---

Loftus, G.R., *What can a perception-memory expert tell a jury?*, Psychonomic Bulletin & Review, 17, 143-148 (2010); Loftus, G.R. & Harley, E.M., *Why is it easier to recognize someone close than far away?*, Psychonomic Bulletin & Review, 12, 43-65 (2005).    For a full *curriculum vitae*, *see* http://faculty.washington.edu/gloftus/CV/CV.html.

61.     In fact, the Kings County District Attorney wrote to the Reading Police Department to verify Mr. Williams's alibi.  In August 1994, the Reading Police Department confirmed, by letter, that "Tony Williams" had been given a ticket on July 2, 1993.  *See* Exhibit 5, Reading Police Letter.

62.     Moreover, records from Reading's Community General Hospital confirm that Mr. Williams received medical treatment there on July 11, 1993—two days after Mr. Mason's murder.  *See* Exhibit 6, Reading Hospital Record.[2]  Thus, documentary evidence supports the truthfulness of Mr. Williams's statements to Detective Scarcella, and places Mr. Williams in Reading just before and just after the murder.

5.   Additional Evidence of Misconduct by Scarcella, Chmil, and Bond Leading to Mr. Williams's False Conviction

63.     In addition to coercing false testimony from Ms. Smith, Detectives Scarcella, Chmil, and Bond disregarded information that tended to exculpate Mr. Williams. For example, two of the witnesses who actually saw the perpetrators flee the scene said they did not recognize Mr. Williams, and their physical descriptions of the perpetrators were inconsistent with Mr. Williams's appearance.  *See* Exhibit 7, Edmond Adams Interview; Exhibit 8, Vanessa Wagner Interview; Exhibit 9, Detective Chmil Notes.

64.     On July 9, 1993, officers interviewed Edmond Adams, who stated that a few minutes after midnight, he was sitting on a bench with his girlfriend, Vanessa Wagner, when he heard one gunshot and saw two black males exit 1245 Eastern Parkway. One of the individuals was 5'2 to 5'4, of medium build; the other was 5'4 to 5'6 and thin.

---

2       The July 2nd citation was in the possession of the defense at the time of trial, but because Mr. Williams exercised his constitutional right not to testify, it was not offered into evidence.  The hospital records were located by The Legal Aid Society during Mr. Williams's appeal.

He stated that the shorter individual appeared to be holding his hand on his waistband.  *See* Ex. 7.

65.     Also on July 9, 1993, investigators interviewed Ms. Wagner, who stated that, like Mr. Adams, she saw two black males run out of the building.  Ms. Wagner described one individual as slim and tall, and the other individual as slim and very short with short hair.  She recalled that the "shorter of the two" was "holding his shirt as if he had a gun under" it.  *See* Ex. 8.

66.     As Scarcella's notes reflect, Mr. Williams is six feet tall—a height that is substantially inconsistent with the descriptions of the perpetrators given by Adams and Wagner.  *See* Exs. 7 and 8.

67.     The evening of July 9, 1993, Scarcella and Chmil showed Mr. Adams and Ms. Wagner the photo array containing Mr. Williams's picture.  Despite seeing the perpetrators from a bench at ground level—*i.e.*, from a much closer and more reliable vantage point than Ms. Smith's—neither identified Mr. Williams as one of the individuals they had seen.  *See* Ex. 9 at 7.

### C.  Mr. Williams's Attempt to Seek Help from the District Attorney's Conviction Review Unit, Subsequent Motion Under NY CPL § 440.10, and Ultimate Release

68.     In 2013, the conviction of David Ranta, a high-profile victim of Detective Scarcella, was overturned.[3]  In that case, Scarcella pressured a witness to make a false identification that the witness later recanted.[4]  After the *New York Times* ran a series of stories raising doubts about Scarcella's work in other cases, the KCDA announced that

---

3       *See* Associated Press, *Retired Detective Defends Record in NYC Case*, Wall St. J., Mar. 30, 2013.

4       *See* Sean Flynn, *Brooklyn's Baddest*, GQ Magazine, Aug. 4, 2014.

it would review at least 50 cases where Scarcella played an important role and where limited evidence was used to convict the defendant, paying particular attention to cases, like Mr. Williams's, where convictions were based on the testimony of a sole purported eyewitness.[5]

69.     Mr. Williams's then-*pro bono* counsel performed a review of the trial record and files received from the KCDA, and conducted an investigation.  Based on this review and investigation, counsel uncovered critical new evidence that was not available at trial and that undermined Mr. Williams's conviction.  The new evidence included, among other things, a sworn affidavit from Ms. Smith, the sole purported eyewitness, stating that she did not, in fact, see Mr. Williams fleeing the crime scene, and that she was pressured to falsely identify Mr. Williams by Detectives Scarcella, Chmil, and Bond.  In July 2014, counsel provided all of this new evidence to the KCDA and its Conviction Review Unit.

70.     Following years of inaction by the Conviction Review Unit, on January 4, 2017, Mr. Williams's counsel filed a motion to vacate Mr. Williams's conviction under C.P.L. § 440.10, including Subsection (1)(g) thereof, based on actual innocence, newly discovered evidence, violations of Mr. Williams's Fifth Amendment rights, and *Brady* violations.

71.     On May 15, 2017, the KCDA filed an opposition to Mr. Williams's § 440 motion.

---

5       *See* Frances Robles, *Panel to Review Up to 50 Trial Convictions Involving a Discredited Detective*, N.Y. Times, July 1, 2013; Frances Robles, *Several Murder Confessions Taken by Brooklyn Detective Have Similar Language*, N.Y. Times, June 12, 2013.

72.     Finally, in July 2018, the KCDA relented, reversed its position, and consented to the relief requested in Mr. Williams's motion.

73.     In a decision dated July 13, 2018, Justice Sharen D. Hudson granted Mr. Williams's motion to vacate his conviction under CPL § 440.10(1)(g).  As a result, the Court vacated Mr. Williams's conviction, dismissed his indictment, and ordered his immediate release.  Mr. Williams was released from Clinton Correctional Facility on the same day.

**D.   The City of New York's Deliberate Indifference to Improper and Dishonest Police Conduct; *Brady* Violations; Prosecutorial Misconduct; and the Failure to Train, Supervise, and Discipline its Employees**

74.     Defendant City of New York acts through policymaking officials for both the NYPD and the KCDA.  At the time of Mr. Williams's arrest, policymaking officials for both the NYPD and KCDA engaged in the following misconduct, which was reflected, and led to the false conviction, in Mr. Williams's case:  acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity; implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the constitutional duties of officers not to fabricate evidence and to accurately report the nature of their investigations to prosecutors, for police and prosecutors to properly document and disclose *Brady* information, and for prosecutors not to commit misconduct such as by giving false and misleading summations.

1.   Investigative Reports

75.     Mr. Williams's case was not a random miscarriage of justice in an otherwise functioning law enforcement regime.  Reports from several independent bodies

demonstrate that Defendant City of New York, during the relevant time period, was plagued by institutional deficiencies that allowed a wanton and reckless culture to develop within the NYPD and KCDA.  This culture allowed employees of the NYPD and KCDA to violate constitutional rights of the citizens of the City of New York without disciplinary risk or repercussions.

76.     On July 7, 1994—about a month before Mr. Williams's trial—the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department issued a report (widely referred to as the "Mollen Report") that addressed corruption in the NYPD.  The Report investigated the 1980s and 1990s through the date of the Report's publishing, a time when Scarcella's reputation for quickly cracking cases grew within the NYPD.  Importantly, the Report described the state of corruption in the present tense and stated that the Commission's "findings raise significant concerns about . . . the potential for these problems to grow without sustained vigilance and oversight."  Exhibit 10, Mollen Report, at 1.

77.     The lack of "sustained vigilance and oversight" noted in the Report spanned the time of Mr. Williams's investigation, faulty lineup, and false identification.

78.     The Mollen Report further noted that "[p]olice perjury and falsification of official records is a serious problem facing the Department" that "taints arrests on the streets."  *Id.* at 36.  The Mollen Report described police falsifications as "probably the most common form of police corruption facing the criminal justice system" and observed "a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a

persistent belief among many officers that it is necessary and justified, even if unlawful." *Id.* at 41.

79.     Importantly, this culture did not persist at the lower levels of law enforcement in spite of policymakers' best efforts.  Rather, the Commission noted that it was "not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch," *id.*, and found that "[t]here is no evidence that anyone in the Department's chain of command has focused on eliminating this practice, including past Police Commissioners and Internal Affairs Chiefs, who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics."  *Id.* at 41-42.  In light of this situation, the Mollen Report determined that "successful enforcement of command accountability requires a complete reinvention of the systems for enforcing it."  *Id.* at 79.

80.     The Mollen Report concluded that "[o]fficers and their immediate supervisors are not the only culprits in tolerating falsifications . . . . the Department's top commanders must share the blame."  *Id.* at 41.

81.     This Court has already found that the Mollen Report "provides powerful evidence that there was a custom and practice within the police department of tolerating corruption to avoid bad publicity" and "characterizes this custom as persistent, widespread, and emanating 'from top commanders, including the commissioner.'" *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014).  Accordingly, this Court has found that "[t]he Mollen Report thus provides evidence that is sufficient to allow a jury to conclude that the supervisory and disciplinary failures described therein constituted a municipal policy for *Monell* purposes[.]"  *Pipitone*, 57 F. Supp. 3d at 191.

82.     The lack of discipline documented in the Mollen Report continues to this day, as demonstrated by a report released by The Independent Panel on the Disciplinary System of the New York City Police Department, chaired by former United States Attorneys the Honorable Mary Jo White and the Honorable Robert L. Capers, and former United States District Court Judge for the Southern District of New York the Honorable Barbara S. Jones.  The Panel's report, released in January 2019, made specific note of the endemic culture of false testimony in the NYPD, which was repeatedly "brought to the Panel's attention."[6]

83.     The Panel noted that while "the Patrol Guide expressly forbids officers from lying in connection with their duties, numerous stakeholders have expressed concerns about lax enforcement and practices that enable bad actors to escape accountability and avoid the presumptive termination penalty."  The Panel "share[d] the concern that the Department does not do so and treats false statement cases too leniently," particularly as several stakeholders "told the Panel that the Department does not charge officers with making false statements at all when the facts would support such a charge," and another "stakeholder told the Panel that certain historic practices may contribute to a culture in which false statements are condoned."

84.     Furthermore, in 2009, the New York State Bar Association's Task Force on Wrongful Convictions released an investigative report covering 53 cases.[7]  It found that "government practices" contributed to more than 50% of New York wrongful

---

6       The report is available at https://www.independentpanelreportnypd.net.

7       The cases spanned from 1964 to 2004 and over 70% of the cases were from 1985 to 1996, an eleven-year period that includes Mr. Williams's arrest in 1993 and conviction in 1994.  Most of the cases were from New York City.  Many were from Brooklyn.  *Final Report of the new York State Bar Associaiton's Task Force on Wrongful Convictions*, April 4, 2009, ("NYSBA Report") Appendix B, at 186.

convictions, including prosecutors' violating *Brady* obligations and "the early prosecutorial focus, especially by the police, on a particular individual as the person who committed the crime coupled with a refusal to investigate to determine if there is a basis to believe, based on available information, that someone else may have committed the crime." NYSBA Report at 19.  Both of these practices contributed to Mr. Williams's wrongful conviction, where i) a material witness order for the sole alleged eyewitness was withheld from the defense, and ii) defendants Scarcella and Chmil's immediate identification of Mr. Williams as a suspect was the result of, as trial counsel observed, "a rumor gone amok." Trial Tr. 214:4-7.

85.     The Task Force recommended "Train[ing] and Supervis[ing] in the Application of *Brady* and Truthful Evidence Rules" for police.  *Id*. at 37.  For prosecutors, the Task Force noted that "despite the clarity and longevity of the *Brady* rule, a sampling of recent published or otherwise available decisions show such conduct still occurs."  *Id.* at 26 (internal cites omitted).  The Task Force therefore suggested that, to the extent not already in existence, prosecutor's offices should create procedures to evaluate and impose sanctions for prosecutorial misconduct.  *Id.* at 29.  In the time leading up to Mr. Williams's arrest, indictment, trial, and post-conviction litigation, the KCDA did not put such procedures into effect.

86.     The post-conviction litigation of the *People v. Jabbar Collins* and ensuing civil litigation in this Court revealed that no such procedure existed at the time of Mr. Williams's arrest and conviction.  It further revealed that the KCDA was deliberately indifferent to or endorsed *Brady* violations generally, and more specifically, the specific *Brady* violation that occurred during Mr. Williams trial.  The *Collins* case concerned *Brady*

violations in the KCDA in 1994 and 1995—the same time as Mr. Williams's trial.  The misconduct in that case involved withholding exculpatory material, including a witness recantation, and witness intimidation.  Post-conviction discovery revealed that District Attorney Charles Hynes—the same District Attorney in charge of the office when Williams was prosecuted—protected instead of disciplined ADAs when their misconduct was discovered.

87.     Hynes first became District Attorney on January 1, 1990.  In the *Collins* case, he and others admitted that the only disciplinary procedure in place for *Brady* violations—like the one here—was for Hynes to personally review the appellate decision to decide if discipline was warranted.  Hynes and other KCDA executives could not identify a single instance of a prosecutor being disciplined during Hynes's entire 24-year tenure.

88.     Hynes also admitted that the facts of the instant case constitute a *Brady* violation.  He testified that although "[t]here wasn't a policy necessary [to disclose material witness orders to the defense] because the prosecutor did it as his routine," *Brady* nonetheless required the prosecutor to disclose a material witness order to the defense.  The prosecution breached this *Brady* obligation at Mr. Williams's trial.

89.     In numerous other cases, police and prosecutors failed to disclose to the defense that key prosecution witnesses had been arrested and were being held in police custody until they completed their testimony for the prosecution.

90.     At the time of Mr. Williams's prosecution, former DA Hynes, as the manager, chief administrator and policymaker of the KCDA, a City agency, created and maintained policies, customs, and usages of deliberate indifference to violations by his

employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Brooklyn, including through (i) manufacturing false and misleading evidence and testimony through improper coercion of witnesses; (ii) knowingly presenting false testimony and arguments at criminal proceedings; (iii) suppressing *Brady* information; (iv) unlawfully arresting, imprisoning, and coercing witnesses; (v) abusing material witness orders, subpoenas, "*Damiani*" orders, and other court process; and (vi) covering up these unlawful practices.

91.     These policies, customs, and usages have led the Second Circuit and numerous courts within this District to recognize analogous Section 1983 *Monell* claims brought by other wrongfully convicted persons.  *See, e.g.*, *Walker v. City of New York,* 974 F.2d 293, 300-01 (2d Cir. 1992) (reversing district court's dismissal of *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Bailey v. City of New York*, 79 F. Supp. 3d 424, 441-43 (E.D.N.Y 2015) (denying City's summary judgment motion on *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Collins*, 923 F. Supp. 2d at 477 (denying City's motion to dismiss *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights, including failure to disclose information concerning a material witness order and other court processes).

92.     These policies, customs, and usages persisted from former DA Hynes's induction as District Attorney in 1990 through (and, in certain respects, beyond) the end of his tenure as District Attorney in 2013.

93.     Former DA Hynes, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced in the commission of constitutional violations of the rights of suspects and defendants by prosecutors and investigators working with the KCDA, particularly in homicide cases, such as Mr. Williams's, where arrest and conviction were most desired by the Office.

94.     These policies, customs, and usages proximately caused the violations of Mr. Williams's constitutional rights described above and his wrongful conviction, imprisonment, and other damages.

95.     Former DA Hynes's policy and practice was to tolerate, fail to discipline, and encourage violations of his Office's constitutional obligations to make timely disclosure to the defense of *Brady* information.  Former DA Hynes's deliberate indifference to such violations created an "anything goes" atmosphere that caused such violations to continue, including in Mr. Williams's case.

96.     Under Former DA Hynes's office-wide policies, customs, and usages, prosecutors and investigators were permitted and encouraged to use illegal tactics to coerce witnesses to testify in the manner prosecutors desired, constituting *Brady* and other constitutional violations, including by:

> (a) lying to courts about their need for and entitlement to material witness arrest warrants, and thereby obtaining authorization to arrest witnesses the KCDA viewed as uncooperative;
>
> (b) abusing material witness orders by failing to bring witnesses directly before the court for appointment of counsel and a judicial hearing (as material witness orders require), and instead implementing the KCDA's "Hotel Custody" Program: kidnapping witnesses and holding them either in the KCDA or in a hotel room, where they would threaten, intimidate, or cajole them into becoming what prosecutors considered cooperative, and keeping the witnesses in the custody of the KCDA until they testified for the prosecution;

(c) issuing and executing improper "office" subpoenas to compel witnesses to attend interviews at the KCDA, despite numerous judicial decisions making clear that such process was unlawful;

(d) misleading courts to issue orders (including "*Damiani*" orders and orders to produce) allowing them to take custody of incarcerated witnesses, in many cases without their counsel or against their will, and bringing them to the KCDA where ADAs would threaten, intimidate, or cajole the witnesses into becoming what prosecutors considered cooperative;

(e) causing the New York State Division of Parole and the State Department of Corrections to illegally revoke the release of prisoners so that prosecutors could gain custody of them and threaten them with indefinite imprisonment unless they "cooperated" by testifying favorably for the prosecution; and

(f) coercing witnesses who have been arrested on unrelated charges to "cooperate" by exploiting their drug withdrawal and dependency, holding them prisoner in remote locations while threatening to interrogate them indefinitely, and threatening harsh prosecution and imprisonment while simultaneously holding out the inducements of leniency and monetary reward.

97.     Under former DA Hynes's office-wide policies, customs, and usages, prosecutors and investigators were permitted and encouraged to refrain from making any record of *Brady* information concerning prospective prosecution witnesses to avoid disclosing information favorable to the defense, despite the fact that disclosure of such information was and is constitutionally required regardless of whether the information were recorded in written form.

98.     Former DA Hynes's training and discipline policies and practices were likewise consciously designed to permit and encourage *Brady* violations.

99.     Prosecutors and investigators were trained on avoiding the creation of *Brady* and *Rosario* material, instructed not to disclose *Brady* information if they could rationalize non-disclosure by subjectively assessing the information as "unreliable" or

"incredible," and encouraged to cover up *Brady* information kept hidden by other members of the KCDA.

100.    Prosecutors were permitted and encouraged not to comply with the KCDA ongoing *Brady* obligations after trial; to resist defendants' efforts to obtain disclosure on appeal, during collateral attacks on convictions, and through FOIL requests; and even to lie or mislead courts in affidavits and testimony, all with the aim of covering up wrongdoing within the KCDA and defeating defendants' efforts to expose misconduct and overturn wrongful convictions.

101.    Prosecutors, in violation of *Brady*, were permitted or encouraged to refrain from disclosing material witness applications, orders, and proceedings; arrest and incarceration of trial witnesses; relocation and other assistance promised or provided to witnesses; and other pressure tactics, promises, and rewards used to influence witnesses.

102.    Through a policy, custom, and practice of not disciplining prosecutors or investigators for *Brady* or other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), former DA Hynes encouraged such violations by demonstrating to his prosecutors and investigators that there would be no negative consequences for their failure to comply with *Brady* and other constitutional requirements. To the contrary, prosecutors who violated defendants' due process rights were promoted, praised, given pay raises, and otherwise endorsed by former DA Hynes and his Office.

103.    Former DA Hynes had no employee handbook, manual, or other document setting forth any disciplinary process or potential penalties for *Brady* or other

constitutional violations by prosecutors or investigators.  In fact, there was no such process or penalties.

104.    Despite dozens of court decisions finding that prosecutors had wrongfully withheld information, in violation of *Brady*, *Rosario*, or state discovery laws, or otherwise had engaged in conduct that misled courts, juries, defendants, and defense attorneys, none of the prosecutors involved was disciplined.

105.    Stunningly, not once during his 24 years in office did former DA Hynes terminate a KCDA prosecutor for prosecutorial misconduct.

### A.    Former DA Hynes Had Ample Notice of the Prosecutorial and Investigative Misconduct Occurring in His Office

106.    Examples of the decisions that put former DA Hynes on notice of the unlawful conduct being committed by his prosecutors and investigators, before such unlawful conduct led to Mr. Williams's false conviction, include:

- *Walker,* 974 F. 2d 293 - Second Circuit upheld *Monell* claim against City of New York for unlawful policies of Brooklyn KCDA that allegedly resulted in withholding of *Brady* material causing plaintiff's wrongful conviction and 18-year imprisonment.

- *People v. Vilardi*, 542 N.Y.S.2d 238 (2d Dep't 1989) - Vacating conviction based on prosecutor's failure to turn over exculpatory police report.

- *People v. Lugo*, 544 N.Y.S.2d 985 (2d Dep't 1989) - Granting motion to vacate conviction based on *Brady* and *Rosario* violations, holding that *Rosario* violation clearly undermined conviction, rendering further *Brady* analysis unnecessary.

- *People v. Lyking*, 537 N.Y.S.2d 314 (2d Dep't 1989) - Prosecutor's improper summation deprived defendant of a fair trial and required reversal of conviction.

- *People v. Rayford*, 158 A.D.2d 482 (2d Dep't 1990) - Prosecutor suppressed exculpatory information concerning use of suggestive identification procedures.

- *People v. Nedrick,* 166 A.D.2d 725 (2d Dep't 1990) - Prosecutor failed to disclose tape-recorded impeachment material.

- *People v. Anderson,* 160 A.D.2d 806 (2d Dep't 1990) - Prosecutor failed to timely disclose impeachment material.

- *People v. Brazzeal*, 172 A.D.2d 757 (2d Dep't 1991) - Prosecutor's improper summation violated defendant's due process rights.

- *People v. Faison,* 176 A.D.2d 752 (2d Dep't 1991) - Prosecutor failed to timely disclose witness's prior statement.

- *People v. Crespo,* 188 A.D.2d 483 (2d Dep't 1992) - Mistrial granted due to prosecutor's *Brady* violation.

- *People v. Brown,* 187 A.D.2d 437 (2d Dep't 1992) - Trial court sanctioned prosecutor for *Brady* violation.

- *People v. Cecora,* 186 A.D.2d 215 (2d Dep't 1992) - Prosecution and police failed to disclose interview notes containing potential impeachment information.

- *People v. Hughes,* 181 A.D.2d 132 (2d Dep't 1992) - Hearing required regarding prosecution's failure to disclose exculpatory police report.

- *People v. Inswood,* 180 A.D.2d 649 (2d Dep't 1992) - Prosecution's failure to turn over *Brady* material was error; assigned prosecutor is subsequently promoted, does not receive negative feedback or personnel action.

- *People v. Lebron*, 585 N.Y.S.2d 498 (2d Dep't 1992) – Prosecution's presentation of false testimony that was "completely unbelievable and untrustworthy" required reversal of conviction.

- *People v. Jackson,* 198 A.D.2d 301 (2d Dep't 1993), *affirming* 154 Misc. 2d 718 (Sup. Ct. Kings Cty. 1992) - Prosecutors failed to timely disclose exculpatory statements; conviction reversed.

- *People v. Gurley*, 602 N.Y.S.2d 184 (2d Dep't 1993) - Affirming trial court's grant of post-conviction motion arising from KCDA's suppression of *Brady* information.

- *People v. Stevens,* 199 A.D.2d 441 (2d Dep't 1993) - *Brady* and *Rosario* material improperly withheld; prejudice not sufficient to require reversal.

- *People v. Cortez,* 149 Misc. 2d 886 (Sup. Ct. Kings Cty. 1990) - Prosecutors and police violated *Brady* and court order by intentionally destroying tape containing impeachment material.

- *People v. Young,* 155 Misc. 2d 878 (Sup. Ct. Kings Cty. 1992), *on remand from,* 79 N.Y. 2d 365 (1992) - Failure to disclose impeachment material required new trial; hearing court condemned prosecution for tailoring testimony.

- *People v. Giddings,* 2/21/92 NYLJ 25 (col. l) (Sup. Ct. Kings Cty. Feb. 21, 1992) - Prosecutor's failure to disclose witness's prior inconsistent statements required conviction to be vacated).

     B.   Examples of the KCDA's Unlawful Policies, Practices, and Customs

      107.    Examples of former DA Hynes's ongoing policies and practices, of encouraging, authorizing, and permitting misconduct by his prosecutors and investigators, include:

- *Leka v. Portuondo,* 257 F.3d 89 (2d Cir. 2001) - Conviction overturned on habeas review due to prosecution's suppression of *Brady* material; prosecutor also misled defense counsel regarding a crucial witness.

- *Boyette v. LeFevre,* 246 F.3d 78 (2d Cir. 2001) - Conviction vacated on habeas review because prosecutors suppressed *Brady* material.

- *Waston v. Greene,* 2009 WL 5172874 (E.D.N.Y. Dec. 30, 2009) - Prosecutors disclosed *Brady* material "too late" for the defense to make use of it even though they were aware of material "more than a year in advance of trial."

- *People v. Scott,* 88 N.Y. 2d 888 (N.Y. 1996) - Prosecution failed to disclose statement regarding polygraph result.

- *People v. Bond,* 95 N.Y. 2d 840 (N.Y. 2000) - Myriad *Brady* violations established at Criminal Procedure Law Section 440.10 hearing, including failure to disclose material witness proceeding concerning principal witness; conviction reversed due to prosecution's failure to disclose prior unrecorded statements to police by prosecution's main witness that she did not see the shooting about which she testified as an "eyewitness."

- *People v. Calabria,* 94 N.Y.2d 519 (N.Y. 2000) - Prosecutor repeatedly defied court's ruling and made false or misleading argument to jury.

- *People v. Jenkins,* 98 N.Y. 2d 280, 287-88 (N.Y. 2002) (Kaye, C.J., dissenting) - Prosecutor's late disclosure of ballistics report "blind sided" the defense and was inexcusable.

- *People v. Fuentes,* 12 N.Y. 3d 259 (N.Y. 2009) - Prosecutor improperly withheld portion of medical records containing potentially favorable evidence for the defense; two judges find the suppression was "deliberate."

- *People v. Khadaidi,* 201 A.D.2d 585 (2d Dep't 1994) - Conviction reversed for prosecution's failure to disclose interview notes with complainant containing prior inconsistent statement)

- *People v. Alvarado,* 201 A.D.2d 486 (2d Dep't 1994) - Prosecution failed to disclose police reports containing impeachment material; conviction reversed.

- *People v. Barnes,* 200 A.D.2d 751 (2d Dep't 1994) - Prosecutor did not record and did not disclose eyewitness's recantation; conviction not reversed because eyewitness ultimately recanted on the witness stand and was adequately cross-examined.

- *People v. Bramble,* 207 A.D.2d 407 (2d Dep't 1994) - Sanctions upheld for prosecution's failure to preserve police audiotapes notwithstanding defense discovery request.

- *People v. Roberts,* 203 A.D.2d 600 (2d Dep't 1994) - Prosecution delayed one year in disclosing exculpatory witness statement, by which time witness was unavailable; conviction reversed.

- *People v. Neptune,* 161 Misc. 2d 781 (Sup. Ct. Kings Cty. 1994) - Prosecution acted unethically by improperly using invalid subpoena to cause a witness to appear for an interview at the KCDA.

- *People v. Scott,* 216 A.D.2d 592 (2d Dep't 1995) - Prosecutor suppressed reports, including polygraph results indicating key witness was withholding information.

- *People v. Rahman,* 231 A.D.2d 745 (2d Dep't 1996) - Matter remitted for hearing concerning prosecution's apparent improper withholding of witness's cooperation agreement.

- *People v. Perkins,* 227 A.D.2d 572 (2d Dep't 1996) – Prosecutor failed to disclose cooperation agreement with witness.

- *People v. Callendar,* 227 A.D.2d 499 (2d Dep't 1996) - Conviction reversed due to prosecutor's failure to turn over notes of detective's prior statement.

- *People v. Bruce,* 224 A.D.2d 438 (2d Dep't 1996) - Conviction reversed for prosecutor's failure to produce police reports containing impeachment material.

- *People v. Dupont,* Kings County Ind. No. 6287/97 - Prosecutor made misrepresentation by claiming KCDA did not possess physical evidence specifically requested by the defense.

- *People v. LaSalle,* 243 A.D.2d 490 (2d Dep't 1997) - Conviction reversed due to prosecutor's "blatant misrepresentation of the facts" during summation.

- *People v. Gourgue,* 239 A.D.2d 357 (2d Dep't 1997) - Prosecutor put notes of complainant's statements in the form of questions to "circumvent" disclosure obligation; conviction reversed.

- *People v. Hill,* 244 A.D.2d 572 (2d Dep't 1997 - Prosecutor sanctioned for failing to disclose 911 tape.

- *People v. Gramby,* 251 A.D. 2d 346 (2d Dep't 1998) - Prosecutor suppressed and failed to timely disclose 911 tape.

- *People v. Campbell,* 269 A.D.2d 460 (2d Dep't 2000) - Prosecutor's suppression of *Rosario* material, a tape-recorded statement by the complainant, required reversal of conviction.

- *People v. Maddery,* 282 A.D.2d 761 (2d Dep't 2001) - Prosecutor's failure to disclose 911 tape before trial as required by law required reversal of conviction.

- *People v. King,* 298 A.D.2d 530 (2d Dep't 2002) - Prosecutor's failure to disclose 911 tape before trial as required by law required conviction to be reversed.

- *People v. Vielman,* 31 A.D. 3d 674 (2d Dep't 2006) - Reversing conviction because prosecutor's summation rested on a "false premise" and was a "blatant attempt to mislead the jury."

- *People v. Jones,* 31 A.D. 3d 666 (2d Dep't 2006) - Prosecution fails to correct the false testimony of a key witness.

- *People v. Thompson,* 54 A.D. 3d 975 (2d Dep't 2008) - Prosecutor suppressed *Brady* material indicating someone other than the defendant committed the crime.

-  *People v. Ramos,* 166 Misc. 2d 515 (Sup. Ct. Kings Cty. 1995) - Due to KCDA policy of not taking notes of witness interviews, trial prosecutor was not aware of information acquired by previously assigned prosecutors for which court had ordered disclosure; conviction vacated on due process grounds.

- *People v. Green,* 10/19/99 N.Y.L.J. p. 30, col. 1 (Sup. Ct. Kings Cty., Oct. 19, 1999) - Prosecution failed to disclose *Brady* material.

- *People v. Davis,* 709 N.Y.S. 2d 345 (Sup. Ct. Kings Cty. 2000) - Prosecution violated court's order to disclose exculpatory evidence to defense before indictment; indictment dismissed.

- *People v. Cannon,* 191 Misc. 2d 136 (Sup. Ct. Kings Cty. 2002) - Prosecution responsible for failure to preserve surveillance photographs.

- *People v. Malik,* 25 Misc. 3d 1214(A) (Sup. Ct. Kings County 2009) - Prosecution's suppression of police report and other documents required vacatur of conviction).

108.   Under Former DA Hynes's policies, customs, and usages, no prosecutor was fired, suspended, fined, or demoted for such misconduct.

109.   Even where misconduct was found to have occurred, no record of the misconduct was placed in the personnel file of any prosecutor or investigator responsible.  No prosecutor was ever reported to outside disciplinary bodies for such misconduct, even when the misconduct violated applicable ethical rules.

110.   To the contrary, in opposing defendants' efforts to overturn their convictions in such cases, Former DA Hynes stubbornly defended the propriety of his employees' behavior, thereby ratifying and signaling his tolerance of it.  Personnel found to be involved in such misconduct continued to receive raises, bonuses, and promotions— sometimes within weeks or even days of court decisions identifying the misconduct.

111.   High-level KCDA officials have acknowledged in deposition testimony that there was no formal disciplinary procedure or policy for prosecutorial or investigator misconduct committed by KCDA employees, and they were unaware of any prosecutor or investigator ever being disciplined during former DA Hynes's tenure for unconstitutional conduct committed during a criminal investigation or prosecution.  In fact, no discipline had been imposed on any of the prosecutors or investigators involved in cases of proven misconduct.

112.    Former DA Hynes's office likewise had no formal policy requiring disclosure of *Brady* information or any written policy on how to disclose it.

113.    Former DA Hynes's office provided no training on how to question or evaluate informant or accomplice witnesses.

114.    One high-ranking official testified that, despite having virtually daily contact with former DA Hynes over many years, he never heard former DA Hynes discuss the training of prosecutors in such areas.

115.    Even after judgments and settlements were entered against KCDA-affiliated individual capacity defendants in various civil rights lawsuits alleging prosecutorial and investigative misconduct, former DA Hynes's office conducted no investigation and imposed no discipline on any of the employees involved.

116.    A number of cases handled by former DA Hynes's office evidence the above policies and practices of encouraging and tolerating misconduct by KCDA staff.

**The Rodney Russ Case**

117.    Early in his tenure, former DA Hynes communicated to his employees his views about witness coercion and abusing court process by vigorously defending his Office's murder conviction obtained in *People v. Russ*, 79 N.Y.2d 173 (N.Y. 1992), a case where the KCDA secured a murder conviction by arresting and threatening a 17 year-old witness with prosecution and imprisonment until she agreed to testify against the defendant.  In reversing that conviction, the New York Court of Appeals condemned the "egregious" behavior of the KCDA in "'legally' coerc[ing] testimony."  *Id.* (citing *Rochin v. California*, 342 U.S. 165, 172 (1952) (conduct that "shocks the conscience"). The court wrote that such conduct prejudiced defendants, victimized witnesses, and undermined the integrity of the criminal justice process.

118.   No training or disciplinary action was taken to remedy the misconduct exposed in the *Russ* case.

### The Jabbar Collins Case

119.   Other examples of the KCDA's practice of improperly coercing false testimony and former DA Hynes's endorsement of that practice include the case of Jabbar Collins, where, as in Mr. Williams's case, the prosecution's key witnesses were secretly arrested and threatened with imprisonment if they did not testify for the prosecution.

120.   As in Mr. Williams's case, the lead prosecutor in Mr. Collins's criminal trial, Michael Vecchione, falsely represented to the jury that his key witness, Edwin Oliva, had no incentive to testify for the prosecution other than to tell the truth.  In fact, Mr. Oliva had been pressured to testify by KCDA detective investigators ("DIs") and Mr. Vecchione himself, and offered leniency in his ongoing criminal matters.

121.   Mr. Vecchione suppressed a variety of *Brady* information, including a pre-trial recantation by Mr. Oliva, and, as in Mr. Williams's case, the abuse of material witness orders to coerce testimony from two additional witnesses, Angel Santos and Adrian Diaz.

122.   Former DA Hynes vigorously defended the *Collins* conviction, including after the revelation of both the suppression of *Brady* information and the improper coercion of witnesses through material witness orders.  Former DA Hynes also approved of the conduct of his prosecutors and investigators in those cases.

123.   Even after two federal judges characterized the conduct of the KCDA in the *Collins* case as "shameful" and a "disgrace," former DA Hynes defended Mr. Vecchione and took no action against him.  In fact, despite consistently Vecchione being

admonished by courts for improper tactics, on November 28, 2007, Hynes issued a press release announcing that he would be personally presenting Vecchione with the Thomas E. Dewey Medal Award on behalf of the New York City Bar Association, "recognizing [his] excellent work" as "an outstanding prosecutor" in Kings County.  Hynes praised Vecchione as "an exceptional prosecutor" who was "truly deserving of this award," and boasted that Vecchione "exemplifies the qualities that serve as an example to all of our prosecutors." Vecchione was subsequently promoted to run the KCDA's Sex Trafficking Unit.

124.    Discovery in Mr. Collins § 1983 lawsuit yielded a host of evidence of the KCDA's unlawful policies, practices, and customs concerning the unlawful detention and coercion of prospective witnesses, including the testimony of former DA Hynes, Mr. Vecchione, former Chief Assistant DA Amy Feinstein, KCDA Homicide Bureau Chief Kenneth Taub, Homicide Bureau paralegal Liz Noonan, and former Supervising DI Stephen Bondor.  Those witnesses confirmed that the KCDA's Hotel Custody program was routine for homicide prosecutors in the 1990s.

### The Ruddy Quezada Case

125.    In the Ruddy Quezada case, the KCDA improperly coerced false testimony from Sixto Salcedo.  Mr. Salcedo was pressured into naming Mr. Quezada as the perpetrator of the crime, but before trial recanted and refused to testify.  Ephraim Shaban, the Assistant District Attorney on the case, submitted an *ex parte* application to the trial court for the issuance of a material witness order for Mr. Salcedo.  The purpose of the material witness order, as in Mr. Williams's case, was to coerce Mr. Salcedo to revoke his recantation and testify as a prosecution witness.

126.    Mr. Shaban told the trial court that Mr. Salcedo had refused to meet with him and said he would not appear voluntarily.  Mr. Shaban then falsely swore that Mr.

Salcedo had failed to comply with a subpoena seeking his attendance.  In fact, Mr. Shaban never had a subpoena served on Mr. Salcedo or even issued a subpoena for him.

127.    Contrary to the trial court's order, Mr. Salcedo was never brought before the court to be arraigned on the material witness warrant, appointed counsel, and provided the hearing required under CPL § 620.50.  Instead, KCDA detective investigators held Mr. Salcedo extra-judicially.  The purpose of the threats and unlawful detention were to extort Mr. Salcedo to change his testimony to support the prosecution's case against Mr. Quezada.

128.    Despite the coercion, Mr. Salcedo told Mr. Shaban that he could not testify because he did not actually see who shot the victim.  Mr. Shaban replied that Mr. Salcedo had already given a statement identifying Mr. Quezada as the shooter and testified in the grand jury.  Mr. Shaban told Mr. Salcedo that if he went back on his prior statements, he would face prosecution for perjury or obstruction of justice.  At the time, Mr. Salcedo was serving a term of supervised release for a federal drug conviction, had an open case being prosecuted by the KCDA (a fact that was never disclosed to the defense at trial), and was not a United States citizen.

129.    Mr. Shaban repeatedly read to Mr. Salcedo the latter's prior recorded statement about the identification of Mr. Quezada.  He told Mr. Salcedo that he would face dire consequences if he did not stick to that version.  As a result of this pattern of coercion and threats, Mr. Salcedo agreed to repeat his previous accusation that he saw Mr. Quezada shoot the victim.

130.    Mr. Salcedo took the stand at Mr. Quezada's criminal trial and testified as the detectives directed him to.  After testifying, Mr. Salcedo was released from

custody.  In summation, both Mr. Shaban and defense counsel focused their arguments on the issue of witness credibility.  Mr. Shaban emphasized to the jury that Salcedo "came forward" to testify.  Mr. Shaban told the jury that Mr. Salcedo "was not hesitant," and, at one point in his summation, contended that "[o]nly one person"—Salcedo—"came forward to testify in this case."  Mr. Shaban told the jury that once they decided that Mr. Salcedo was credible, they did not even need to consider the three alibi witnesses who testified for the defense.

131.    Mr. Shaban hid the existence of the material witness order through years of post-conviction litigation in Mr. Quezada's case, which was only discovered through discovery ordered by the Eastern District of New York in a *habeas* proceeding.

132.    Mr. Shaban was never disciplined as a result of the Ruddy Quezada case and is currently (or was until recently) a supervisor within the KCDA.

**The Bensale Neptune Case**

133.    In a July 7, 1994 decision, in another murder case being prosecuted by the Homicide Bureau under its then-Bureau Chief, former ADA Vecchione, Justice Gerges condemned a homicide ADA for serving a subpoena on a witness on a day there would be no testimony "in the hope that it would coerce the witness into consenting to be interviewed prior to testifying."  Justice Gerges denounced the "unprofessional conduct" under numerous prior court decisions outlawing the practice, and admonished the KCDA that the "practice should not be replicated."  *People v. Neptune*, 161 Misc. 2d 781, 785; 615 N.Y.S.2d 265, 267 (Sup. Ct. Kings Cty. July 7, 1994) (citations and quotations omitted).

## The Brian Bond Case

134.    Despite Justice Gerges's admonishment, those abusive practices continued.  In another murder case, *People v. Brian Bond*, Ind. No. 13991/91, the assigned ADA defied Justice Gerges and the decisions of the Court of Appeals and the Appellate Division upon which his decision had been based.  Former ADA Stan Irvin and DIs working under his direction illegally subpoenaed all prospective witnesses to their office to coerce them to submit to office interviews before testifying at trial.  Without disclosing to the court the impropriety of his subpoenas, Irvin then obtained material witness orders authorizing the arrest of any witness who failed to comply with the subpoenas.

135.    One witness, a crack addict named Carmen Green, had told police detectives and KCDA Dis that she had not seen the incident in question.  When DIs found her, they noted that she was too "impaired" to comply with the subpoena.  They knew as well that she was under investigation (and feared that she and her children would be arrested) for dealing drugs out of her apartment.  Former ADA Irvin obtained a material witness warrant authorizing Ms. Green to be taken "forthwith" to court.  Then, without waiting for an attorney to be appointed for Ms. Green, former ADA Irvin had her brought to his office, where he and the detectives threatened her with incarceration and interrogated her on and off for eight hours.  Only after the witness submitted to their custody did the ADA and DIs finally bring her to court, after midnight, so that a judge could sign an order ratifying what was misrepresented as her "consent" to be detained until the conclusion of her testimony.

136.    After this litany of unlawful behavior, former ADA Irvin continued to violate *Brady* by not disclosing to the defense Ms. Green's prior statements denying having seen the shooting, her eight-hour unlawful interrogation, her evident drug

impairment, the threats made to arrest her and her family, and promises to relocate her at public expense.  Nor did he disclose the statements of her other family members that she was not present during the shooting, or that they, too, had been promised, and did receive, relocation assistance.  Based on Ms. Green's testimony, Mr. Bond was convicted of murder.

137.    During an evidentiary hearing held in 1998 concerning Mr. Bond's subsequent motion to vacate his conviction due to *Brady* and related constitutional violations, an unapologetic then-ADA Irvin testified that it was the Office's regular practice to pick up witnesses on material witness warrants and, instead of bringing them directly to court "forthwith" as such warrants direct, to forcibly take them for interrogation to the KCDA.

138.    In 2000, the New York Court of Appeals vacated Mr. Bond's conviction due to the Office's failure to disclose Ms. Green's statements denying having seen the homicide. The KCDA Appeals Bureau had argued, on behalf of then-DA Hynes, that it had no obligation to disclose statements that, in its view, were "untrue."

**The Zaher Zahrey Case**

139.    In August and September 1994, during the KCDA's investigation of an NYPD detective, Zaher Zahrey, on corruption allegations, detectives working under the supervision of KCDA prosecutors obtained court orders to produce a prospective witness, Sidney Quick, who was a crack addict and a career criminal, for interviews on the condition that his attorney would be present, but then, with the prosecutor's approval, interrogated him without notifying his attorney.

140.    In March, 1995, after Mr. Quick had been sent upstate to serve his sentence, detectives, with the prosecutor's approval, again met with Mr. Quick without his

attorney, and, through a combination of coercion and promises of expedited release, caused him to adopt a story they suggested to him, implicating the target of their investigation, which they knew from other evidence was false.  They tape recorded this meeting and gave the tape to the prosecutor, who listened to it, heard the coercion and improper promises, and heard the encouragement of Mr. Quick to adopt a false story.  Rather than condemn the detectives' tactics, however, the prosecutor told them that Mr. Quick's statements were "promising."

141.    In or about January 1996, detectives working directly under KCDA prosecutors' supervision arrested several other individuals in the hope of turning them into prosecution witnesses, took them to remote locations instead of to court, and illegally interrogated them in violation of their rights to counsel and prompt arraignment.

142.    Because none of Mr. Quick's false story could be corroborated, which is a prerequisite for prosecution under New York law, KCDA prosecutors obtained former DA Hynes's approval to recommend the case to federal authorities for prosecution. In doing so, however, former DA Hynes's prosecutors did not disclose to the federal authorities the tape, the improper interrogation tactics used with Mr. Quick, or numerous of Mr. Quick's prior inconsistent statements.  When Mr. Quick inadvertently disclosed to the federal prosecutor that he had been taped, KCDA employees delayed disclosing the tape for several weeks to ensure that the federal authorities went ahead with the high-profile indictment and publicly committed themselves to the case.  Mr. Zahrey ultimately was acquitted, but not until he had spent nearly nine months in pretrial confinement.

**The Sarni Leka Case**

143.    Former DA Hynes likewise ratified his employees' misconduct in the 1990 Sarni Leka prosecution.  Shortly after his 1990 conviction, Mr. Leka moved to

vacate his conviction because the prosecution intentionally suppressed a variety of *Brady* information.  Not only did the KCDA vigorously oppose Mr. Leka's motion and appeal, but former DA Hynes wrote that he had "personally reviewed the facts and circumstances" of the case and "Mr. Leka's due process right as a defendant were amply and ably protected."  Years later, however, the U.S. Court of Appeals for the Second Circuit vacated Mr. Leka's conviction, finding that the KCDA had actively "suppressed" exculpatory evidence, decrying one of its arguments as "ridiculous," and concluding that the evidence the prosecution had suppressed would have had a "seismic impact" upon the results of the trial.  *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001).  With the only two identification witnesses having recanted their testimony, the KCDA was forced to dismiss the case and Leka, an apparently innocent man, was released after serving 12 years in prison.

144.    No training or disciplinary action was taken to remedy the misconduct exposed in the *Leka* case.

C.  Scarcella: Case Studies in Improper Conduct

145.    The Mollen report and NYSBA Report revealed a laissez-faire NYPD regime and a stunning pattern of falsification.  These findings are illustrated by the conduct of defendant Scarcella.

146.    In a 2007 episode of the "Dr. Phil Show," Scarcella bragged that he didn't "play by the rules" as a homicide detective.  Most recently in July of 2019, in a Brooklyn Supreme Court Hearing to overturn Eliseo DeLeon's murder conviction, defendant Chmil testified that he and Scarcella "used some questionable tactics."

147.    These are indicia of unprincipled detectives.  But allegations over the last several years indicate that defendant Scarcella engaged in a pattern of corrupt,

unconstitutional, and dishonest police practices before and during the time that he was detective on the instant case.

148.    As noted above, eight other Scarcella convictions have been vacated where Scarcella tainted line-up identifications or coerced individuals to testify as eyewitnesses to events that they had not, in fact, observed (John Bunn, Rosean Hargrove, David Ranta, Derrick Hamilton, Roger Logan, Robert Hill, Alvenna Jennette, Darryl Austin).

149.    As noted above, the 1993 Scarcella-led investigation that resulted in Mr. Williams conviction falls within a judicially recognized window of Scarcella's misconduct.    As Judge ShawnDya Simpson noted in her opinion vacating Rosean Hargrove's 1992 conviction, Scarcella "was at the time of the investigation engaged in false and misleading practices.  The cases of David Ranta, Derrick Hamilton, Robert Hill, Alvena Jennette, and Darryl Austin that were investigated by Scarcella and prosecuted contemporaneously with this case in the early nineties demonstrate this pattern and practice."  *People v. Hargrove*, 16 N.Y.S.3d 793 (Sup. Ct. 2015).

150.    The pattern and practice of Scarcella's misconduct often concerns strikingly similar circumstances to the those that caused Ms. Smith's false identification. For example, during David Ranta's conviction review it was revealed that one of the witnesses who identified Mr. Ranta as the shooter, Menachem Lieberman, immediately prior to entering the lineup room in August of 1990, was told by Defendant Scarcella to "pick the guy with the big nose."[8]

---

[8]    Midway through Ranta's trial, the judge discussed Scarcella and other detectives, stating that they had "taken it upon themselves to be judge, jury and partial executioner."

151.   In another example, a New York Times investigation reported that the District Attorney's inquiry into defendant Scarcella's cases revealed that one witness, Sharon Ivory, says he was coaxed into giving a false identification of a suspect in a photo array in a Scarcella-related murder case.[9]

152.   By way of further example, in July of 2017, in support of its joint motion to vacate the conviction of Jabbar Washington, the KCDA stated that defendant Scarcella "intentionally and improperly" testified to a non-responsive statement to make it falsely appear that a witness had identified Washington from a lineup as the perpetrator rather than as someone she knew from her neighborhood.

153.   During both defendant Scarcella's heyday and today, judges have decried his various forms of misconduct.

> (a) In the 1987 trial of James Jenkins, Justice Egitto condemned Scarcella for his manipulative conduct of an identification procedure.  This included allowing the witnesses to mingle together and telling the witnesses, "We have the guy that committed the murder."
>
> (b) In vacating the conviction of Rosean Hargrove, Judge ShawnDya L. Simpson stated "[t]he pattern and practice of Scarcella's conduct . . . manifest[s] a disregard for rules, law and the truth."
>
> (c) In vacating Shabaka Shakur's conviction in May of 2015, Judge Desmond Green determined that defendant Scarcella has a "propensity to embellish or fabricate statements."

154.   Additional allegations reveal that Scarcella employed other dishonest techniques to frame innocent individuals, including, *inter alia*, fabricating

---

9      Frances Robles, "Murder Witness Says Police Coached Lie in 1995," *The New York Times*, October 3, 2013, A1.

written confession statements (Louis Holmes, Shabaka Shakur) and coercing false confessions through psychologically coercive techniques (Roger Logan, Vanessa Gathers, Jabbar Washington).

155.   The vast number of cases alleging Scarcella's misconduct is itself evidence that the NYPD knew of and ignored his unconstitutional practices.  The KCDA has asked judges eight times to reverse guilty verdicts that defendant Scarcella helped obtain.  Six additional Scarcella-related convictions have been vacated.  He is under scrutiny in more than 50 Brooklyn cases that are being reviewed for possible misconduct.

156.   A media favorite and legend within the NYPD, Scarcella's conduct could not have escaped notice.  The Daily News' Pulitzer Prize-winning columnist Mike McAlary wrote in 1996 that "[i]n big cases, they bring in Scarcella."  Scarcella rose to the highest rank of detective first-grade, and, upon information and belief, won numerous "Outstanding Police Investigation" awards from the Chief of Detectives.

157.   Given this notoriety and the number of known instances of misconduct that occurred in the presence of other police officers and supervisors—some of whom participated in the misconduct with Scarcella—it is a near certainty that the NYPD knew of his deliberate or reckless conduct and either encouraged it or failed to train, supervise, or discipline for said conduct.

158.   This enabling culture permitted and caused the wrongful prosecution and conviction in Mr. Williams's case.

159.   Defendant Scarcella himself testified during the CPL § 440.10 motion hearing of Shabaka Shakur (who succeeded on his claim that Scarcella fabricated Mr. Shakur's confession) that there was essentially no oversight and supervision of

Brooklyn homicide detectives in the 1980s: they could take cases as they wished and investigate them in whatever manner they desired.  Scarcella thus admitted that the NYPD maintained a laissez-faire policy, pattern, practice, and custom when it came to its homicide detectives.  Their constitutional violations would go unmonitored, unchecked, and undisciplined.

160.    Importantly, Scarcella is not an isolated case of a detective gone rogue.  Additional proof of a culture of unconstitutional conduct in the NYPD at that time exists in the voluminous record of other Brooklyn cases—not involving Scarcella—that demonstrates that other Brooklyn homicide detectives felt free to act similarly.  This pattern of behavior beyond Scarcella supports a clear inference that unscrupulous tactics were considered normal, acceptable, and encouraged within the Brooklyn homicide squad, as demonstrated in the following cases:

> (a) *David McCallum and Willie Stuckey* – In October 1985, Brooklyn Detective Joseph Butta allegedly coerced false confessions from David McCallum and Willie Stuckey through the use of physical intimidation (slapping McCallum in the mouth and drawing blood, and hitting Stuckey three or four times with an open hand), threats of physical intimidation (with McCallum, picking up a chair and threatening to hit him across the head with it) and promises of leniency, *e.g.*, telling Stuckey that he could go home if he only cooperated ("Q. And what did he tell you would happen to you if you said those things? A. He told me he was going to call my house and he's going to let me go"; "Q. And right after you made the tape, did you think you were going home? A. Yes.").  Both men recanted immediately and, tellingly, both confessions contained inconsistencies, false fed facts and fabrications.  The defendants' motions to vacate the convictions were granted on October 15, 2014, absent objection from the KCDA.

(b) *Antonio Yarbough and Sharrif Wilson* — On June 18, 1992, 18-year-old Antonio Yarbough came home to find that his mother, 12-year-old sister and young family friend, also 12 years old, had been savagely murdered, tied up, stabbed and garroted with electrical cords. Yarbough, who reported the crime to the police, and a 15-year-old friend, Sharrif Wilson, confessed to the murders later that same day. Both men were convicted (in Yarbough's case after a second trial, the first ending in a mistrial) and served nearly 22 years in jail before DNA evidence ruled them out as perpetrators. In 2014, a Kings County Supreme Court Justice granted their motion to vacate, absent objection from the District Attorney. According to a federal civil rights complaint filed by Yarbough, the NYPD allegedly used a combination of physical and psychological coercive techniques to secure the confessions, the latter including sleep deprivation, false evidence ploys and false promises of leniency (including allegedly telling Wilson that they would let him go home if he would only tell them what they wanted to hear).

(c) *Colin Warner* — Convicted in 1982 for the 1980 shooting death of Mario Hamilton; the victim's brother, Martell Hamilton, asserted that a member of the NYPD pressured him into picking out a photograph of Warner as someone he may have seen near the scene of the crime. Warner's motion for exoneration was granted in 2001, absent objection from the KCDA.

(d) *Barry Gibbs* — Convicted in 1988 for the murder of Virginia Robertson. Gibbs was exonerated in 2005 after the sole eye witness, David Mitchell, recanted his line-up and trial identification of Gibbs. Mitchell asserted that NYPD Detective Louis Ippolito had threatened his family if he did not identify Gibbs.

(e) *Derrick Deacon* — Convicted in 1989 for the murder that same year of Anthony Wynn. Colleen Campbell was a witness who saw the shooter in the hallway of the apartment building where the shooting took place, and who gave a physical

description of him to the NYPD.  When the NYPD identified Deacon as a suspect, she told them it was definitely not Deacon, a man she knew from the neighborhood.  Although she was called as a defense witness at trial to testify to that effect, she wavered on the stand and said she could not be sure.  Years later, she testified in exoneration proceedings that the NYPD pressured her prior to her testimony, threatening her with the loss of her children if she did not cooperate with them.  Although Deacon lost his motion to vacate at the Supreme Court level, the Appellate Division reversed, the case was re-tried in 2013 and he was acquitted.

(f) *Jonathan Fleming* — Convicted in 1990 for the shooting murder of Darryl Rush in 1989.  Jacqueline Belardo was a key witness at Fleming's trial—she testified to having witnessed the shooting and said she recognized Fleming as the shooter.  That testimony was false.  Belardo only heard shots and did not see any shooter.  She recanted her testimony and asserted that she agreed to identify Fleming at trial only after police officers threatened her with jail time on an unrelated felony larceny charge.  Her assertion was corroborated by evidence of that larceny arrest and the charge's subsequent dismissal.  Fleming's motion for exoneration was granted in 2014 absent objection from the KCDA.

(g) *Carlos Davis* — Acquitted in 1991 of the 1988 murder of Norris Williams but convicted of criminal possession of a weapon; it was later determined that the sole alleged eye-witness to the murder, supposedly Christina Smith, gave a false name.  Her actual name was Kristie Hayes.  The KCDA joined in Davis' motion to vacate his conviction in April 2015, after the CRU interviewed Hayes and determined that she lacked credibility.  Davis' pending federal civil rights complaint alleges that, desperate to save their criminal case after other alleged eye-witnesses recanted or refused to testify, Kings County Assistant District Attorneys and a sergeant in the NYPD located Smith/Hayes and fed her a false narrative for use at trial.

161. Criminal and civil cases demonstrating the unconstitutional patterns, policies, customs, and usages of the NYPD may be further inferred from numerous cases in which the NYPD violated its *Brady* obligations and the NYPD turned a blind eye to officer dishonesty, as demonstrated in the following cases:

(a) *People v. Cortez*, 149 Misc.2d 886 (Sup. Ct. Kings Co. 1990) (police violated "spirit" of *Brady* by intentionally destroying a tape they were ordered by the court to preserve and finding that the DA's Office shared responsibility and the indictment was dismissed);

(b) *People v. Moss*, 176 A.D.2d 826 (2d Dept. 1991) (conviction reversed for police officer's loss and/or destruction of contemporaneous description of the defendant);

(c) *People v. Clausell*, 182 A.D.2d 132 (2d Dept. 1992) (police failed to disclose buy report with description of suspect that was inconsistent with officer's testimony and new trial ordered for *Brady* violation);

(d) *People v. Nikollaj*, 155 Misc.2d 642 (Sup. Ct. Bronx County 1992) (new trial ordered for *Rosario* violations where police failed to turn over numerous inconsistent statements of complainant officers);

(e) *People v. Dunn*, 185 A.D.2d 54 (1st Dept. 1993) (conviction reversed in part where, among other things, police detective destroyed interview notes);

(f) *People v. Morrow*, 204 A.D.2d 356 (2d Dept. 1994) (conviction reversed where a significant portion of police report was not disclosed);

(g) *People v. White*, 200 A.D.2d 351 (Pt Dept. 1994) (conviction reversed where DD-5 containing *Brady* and *Rosario* material was not disclosed, and only was discovered through defendant's post-conviction FOIL request to the NYPD and Bronx DA's Office);

(h) *People v. Anderson*, 222 A.D.2d 442 (2d Dept. 1995) (conviction reversed where scratch notes lost or destroyed due to officer's "lack of due care");

(i) *People v. Brogdon*, 213 A.D.2d 418 (2d Dept. 1995) (conviction reversed where notes made by NYPD sergeant were withheld from defendant, and where identification by undercover "cannot be said as a matter of law" to have been "merely confirmatory and not suggestive."

(j) *People v. Joseph*, 86 N.Y.2d 565 (1995) (adverse inference instruction appropriate where police deliberately destroyed interview notes);

(k) *People v. White*, 232 A.D.2d 436 (2d Dept. 1996) (conviction reversed due to loss of police officer's memo book through lack of due care, where there was a serious identification issue, and defendant was prejudiced by his inability to cross-examine officer using missing memo book);

(l) *People v. Gallman*, 240 A.D.2d 512 (2d Dept. 1997) (conviction reversed for failure to disclose notes of police interview with a key witness; officer's typewritten notes were not duplicative equivalent because they contained "variations");

(m) *People v. Jackson*, 237 A.D.2d 179 (1st Dept. 1997) (conviction reversed for *Brady* violation consisting of the withholding by the police of internal affairs reports that contained entries that were significantly at variance with prosecution's evidence at trial and were favorable to defendant);

(n) *People v. Branch*, 175 Misc.2d 933 (Sup. Ct. Kings County 1998) (People successfully fought motion to vacate judgment based upon confession of real killer; conviction overturned in 2002 after key prosecution witness recanted and said police paid him for his cooperation);

(o) *Hart v. City of New York*, 186 A.D.2d 398 (1st Dept. 1992): (damage award upheld against police officers who gave false grand jury and trial testimony);

(p) *Gurley v. City of New York, et al.*, 95-cv-2422 (E.D.N.Y., settled 8/21/97, $1,7500,000) (conviction obtained in 1972 was vacated over 20 years later based on prosecutor's withholding of exculpatory evidence, including an NYPD ballistics report; complaint alleged that NYPD had longstanding policy of deliberate indifference to the

constitutional requirement that exculpatory evidence be
preserved and disclosed to defendants);

(q) *Napoli v. City of New York, et al.*, 97-cv-1255 (E.D.N.Y.,
settled 4/9/99, $60,000) (plaintiff arrested on weapons
possession and assault charges based on false testimony by
NYPD officers in grand jury; complaint alleged *Monell*
theory of liability based on City's deliberate indifference to
constitutional obligations of the NYPD, failure to train and
supervise police officers, and negligent hiring of officers,
which caused violations of plaintiff's constitutional rights);

(r) *Gordon v. City of New York, et al.*, 97-cv-8035 (S.D.N.Y.,
settled 11/12/98, $40,000) (plaintiff arrested without
probable cause based on false allegations in felony
complaint made by NYPD officers; charges dismissed by
prosecutor three months after arrest);

(s) *Jefferson v. City of New York, et al.*, 98-cv-1097 (E.D.N.Y.,
settled 4/14/99, $175,000) (plaintiff corrections officer
arrested on drug charges without probable cause; charges
pending for five months before grand jury returned no true
bill; complaint alleged that NYPD officers failed to inform
prosecutors of their knowledge of plaintiff's innocence
during the prosecution);

(t) *Sweazie v. City of New York, et al.*, 99-cv-419 (E.D.N.Y.,
settled 10/20/99, $20,000) (plaintiff arrested on weapons
possession charges; prosecution continued based on NYPD
officers' false statements in felony complaint; charges
dismissed when grand jury voted no true bill);

(u) *Lovell v. City of New York*, et al., 00-cv-0002 (S.D.N.Y.,
settled 10/20/00, $40,000) (plaintiff arrested without
probable cause for turnstile jumping based on false
statements made by NYPD officer in criminal complaint;
complaint alleged *Monell* theory of liability based on the
City's deliberate indifference to constitutional obligations
of the NYPD, failure to train police officers, and negligent
hiring of officers, which caused violations of plaintiff's
constitutional rights; also alleged NYPD's institutional
failure to follow up on civilian complaints made to IAB and
CCRB); and

(v) *Crespo v. City of New York, et al.*, 93-cv-8847 (S.D.N.Y.,
settled 8/29/06, $25,000) (plaintiff arrested without
probable cause on weapons possession charges; complaint

alleged *Monell* claim based on NYPD's "foster[ing of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals").

## DAMAGES

162.    This action seeks damages for the period from October 1, 1993 (the date of Mr. Williams's arrest) through the present.  The Defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith and malicious acts, misdeeds, and omissions caused Mr. Williams to be maliciously prosecuted, unfairly tried, wrongfully convicted, and to endure almost 24 years of wrongful imprisonment, including the physical and mental damage arising therefrom.

163.    Mr. Williams went to prison as a teenager and left as a 43-year-old man.  He spent his entire 20s and 30s imprisoned for a crime he did not commit.  During his wrongful imprisonment, Mr. Williams suffered extreme hardships and lost opportunities, including, without limitation, sexual assault, physical assault, mental illness, the denial of adequate mental healthcare, attempted suicide, pain and suffering, and the loss of 24 years of his life.

164.    Mr. Williams spent much of his time in prison in solitary confinement—at one point over two consecutive years—enduring a practice that a robust scientific literature has established leads to serious psychological harm.

165.    As a direct and proximate result of the acts of Defendants, the injuries and damages sustained by Mr. Williams, arising from the deprivation of his civil rights, include: the violations of his clearly established rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; personal injuries; past and future pain and suffering; past and future severe mental anguish; past and future emotional

distress; extreme fear; economic damages including loss of income and diminution in future earning potential and the inability to obtain certain professional licenses; infliction of physical illness and injury resulting from his confinement; humiliation, indignities, embarrassment, degradation, egregious injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal care, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

166.    When Mr. Williams was incarcerated, he lost his chance to have a meaningful relationships with his family members and friends—several of whom died while he was in prison.

167.    All the alleged acts, misdeeds and omissions committed by the individual Defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly or with bad faith, and said proscribed conduct of the individual defendants meets all of the standards for imposition of punitive damages.

## FIRST CAUSE OF ACTION

### 42. U.S.C. § 1983

*Denial of Due Process and Right to a Fair Trial,*
*Fabrication of Evidence, and Suppression of* Brady *Information*
*(United States Constitution Amendments V, VI, and XIV)*

### Against Defendants Scarcella, Chmil, and Bond

168.    Mr. Williams repeats and realleges each and every allegation contained in the proceeding paragraphs above as if fully set forth herein.

169.    Defendant Bond, Scarcella and Chmil, acting deliberately, with malice and under color of law, deprived Mr. Williams of his clearly established rights under the Fourth and Fourteenth Amendments to the Constitution of the United States to be free from unreasonable seizure.  They did so by knowingly and intentionally manufacturing, caused the manufacturing of, or failing to intervene in the manufacturing of false or misleading evidence by coercing Ms. Smith to give inculpatory testimony against Mr. Williams.

170.    No person of reasonable caution and acting in good faith, having the knowledge and information defendants Bond, Scarcella and Chmil had, would have been warranted in concluding that Mr. Williams was involved in the death of Marvin Mason, such as to support a probable cause determination.  Even setting aside their knowledge that they had coerced Ms. Smith to identify Mr. Williams, these defendants knew or, in the absence of deliberate indifference, recklessness and gross negligence, should have known that there were numerous reasons for skepticism about the truth of the identification.  These include, but are not limited to, (i) their dependence on Chris Mason's street investigation in identifying Mr. Williams, (ii) Ms. Smith's repeated statements that she could not make an identification; (iii) Mr. Williams's well-supported alibi, (iv) the complete absence of physical and forensic evidence tying Mr. Williams to the murder; (v) the lack of any motive attributable to Mr. Williams; (vi) the implausible height and distance of Ms. Smith's purported identification, and (vii) the discrepancies between Mr. Williams's physical characteristics and the physical descriptions of the perpetrators given by two ground-level eye-witnesses, both of whom did not identify Mr. Williams.

171.    The presumption of probable cause created by the grand jury indictment is overcome by the fact that Mr. Williams's indictment was secured based on perjury and other bad faith police misconduct.   Specifically, the identification of Mr. Williams adopted by Ms. Smith was, upon information and belief, the central piece of evidence presented to the grand jury and proximately caused the resulting indictment.

172.    Defendants Bond, Scarcella and Chmil knew, intended, or were deliberately indifferent to the fact that the false and misleading evidence would deprive Mr. Williams of a fair trial and result in his wrongful conviction and incarceration.

173.    Defendants Bond, Scarcella and Chmil knew and intended that *Brady* information—including their coercion of Ms. Smith to testify—would be concealed from Mr. Williams and his attorney.

174.    Defendant Bond, Scarcella and Chmil's conduct, committed in concert with one another or others, deprived Mr. Williams of his rights under the Constitution: (a) not to be prosecuted, convicted, or imprisoned based on false, fabricated, manufactured, or misleading evidence, including the testimony of Ms. Smith who was improperly influenced, coerced, and manipulated to give false testimony, and whose testimony Defendants knew was false, in violation of the Due process and Fair Trial Clauses of the Fifth and Fourteenth Amendments to the United Sates Constitution; and (b) to timely disclosure of material evidence favorable to the defense under *Brady* in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution.

175.     Defendants' acts and omissions proximately caused the continuation of Mr. Williams's criminal prosecution, his conviction, his loss of liberty and detention, and his resulting damages.

176.     Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to Mr. Williams's constitutional rights.

177.     Defendants' falsification of evidence, coercion of Ms. Smith, and arrest of Mr. Williams without probable cause establishes that they acted with actual malice.

178.     The prosecution terminated in Plaintiff's favor when his conviction was eventually vacated.

179.     Mr. Williams was, in fact, innocent of the crimes for which he was convicted and incarcerated.

180.     Defendants actions were willful, malicious, oppressive, and reckless, and were of such a nature that punitive damages should be imposed.

## SECOND CAUSE OF ACTION

### 42. U.S.C. § 1983

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)

### Against Defendant City of New York

181.     Mr. Williams repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

182.     At the time of Mr. Williams's prosecution, continuing through the time his conviction was vacated, the NYPD, in conjunction with the KCDA, both agencies of defendant New York City, created and maintained policies, customs, and usages of

deliberate indifference to violations of the constitutional rights of individuals who were investigated and criminally prosecuted in Brooklyn, including through (i) manufacturing false and misleading evidence and testimony through improper coercion of witnesses; (ii) knowingly presenting false testimony and arguments at criminal proceedings; (iii) suppressing *Brady* information; (iv) unlawfully arresting, imprisoning, and coercing witnesses; (v) abusing material witness orders and other court processes; and (vi) covering up these unlawful practices.

183.    Just one month before Mr. Williams's trial, the Mollen Commission investigated a time period covering the same years that Mr. Williams was unlawfully arrested and falsely convicted.  The Mollen Report exposed the NYPD's practice of failing to properly train, supervise, and discipline officers for fabricating evidence, engaging in improper police investigations, and failing to turn over *Brady* material.

184.    This court has previously found that the Mollen Report provides sufficient evidence to establish that there was an unlawful custom or practice within the NYPD during the time period in question.  *See e.g.*, *Pipitone* at 191.  Indeed, the 1993 investigation of Marvin Mason's murder, and the resulting conviction of Mr. Williams, falls within a judicially recognized window wherein Scarcella "engaged in false and misleading practices."  *People v. Hargrove*, 16 N.Y.S.3d 793 (Sup. Ct. 2015).

185.    As the Mollen Report found, Defendant Scarcella's misconduct could not have been isolated or unknown within the NYPD.  Rather, a laissez faire NYPD culture, paired with a statistic-obsessed KCDA, allowed Scarcella to continuously violate the constitutional rights of the citizens of New York City, including Mr. Williams.  In Mr.

Williams's case, Defendants Scarcella, Chmil and Bond manufactured an identification to secure Mr. Williams's unlawful arrest, conviction, and imprisonment.

186.    The size and magnitude of Scarcella's misconduct, including with the accompliceship of defendant Chmil and other officers, could not have gone unnoticed. Yet Scarcella suffered no consequences.  He was never disciplined in any meaningful way beyond being reassigned to different precincts where he could continue his misconduct.  In fact, to this day, the NYPD continues to defend Defendant Scarcella, despite 14 of his wrongful convictions (including Mr. Williams's) having been exposed and reversed.

187.    The prosecutor's conduct in this case also exemplifies the KCDA's culture during this time period that valued winning over the truth or defendants' constitutional rights.  Former DA Hynes has admitted in litigation that he and high-level KCDA management failed to discipline prosecutors who were found by appeals courts to have acted improperly by withholding *Brady* material and engaging in other misconduct. This created a *de facto* policy of immunity from disciplinary action that fostered prosecutorial misconduct so long as it secured convictions.  Such prosecutorial misconduct included, *inter alia*, suppressing *Brady* information and misleading witnesses, as in the instant case.

188.    Hynes has also admitted that withholding a material witness order from the defense would constitute a *Brady* violation—the exact conduct that occurred in Mr. Williams's case.  The ADAs prosecuting Mr. Williams knew that District Attorney Hynes would not only fail to discipline them, but that he would support them and oppose any attempts to uncover the wrongdoing of wrongful convictions.

189.    The violations of Mr. Williams's constitutional rights and his resulting injuries were proximately and foreseeably caused by conduct, chargeable to the NYPD, the KCDA, former DA Hynes, and by extension, the City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Mr. Williams, subject to investigation and prosecution by the KCDA, including:

    (a) The institution and implementation of inadequate and unlawful policies, procedures, and customs concerning:

        i.   the duty not to create or use false or misleading evidence, testimony, and arguments during criminal proceedings, including bail hearings, pretrial hearings, trials, and post-conviction proceedings;

        ii.   the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements, and argument, whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means; and

        iii.   the continuing duty to obtain, preserve, and timely disclose, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses; and

    (b) the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

190.    The foregoing express or *de facto* policies, practices, and customs (including the failure to properly instruct, train, supervise, or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of New York, who knew that such policies, procedures, regulations, practices, and

customs implicated issues that regularly arise in the investigation and prosecution of criminal cases.

191.     Former DA Hynes and his delegates knew of the unconstitutional conduct occurring among KCDA prosecutors and investigators in light of the numerous credible allegations, many substantiated by judicial decisions, that prosecutors and investigators (i) wrongfully withheld, lost, or destroyed evidence favorable to the defense that the prosecution was required to timely disclose to the defense under *Brady*; (ii) had presented or failed to correct false or misleading testimony and argument; and (iii) had abused judicial process to coerce false or inherently unreliable statements or testimony from witnesses.

192.     Further evidence of the unconstitutional conduct occurring and the need for proper training, supervision, and disciplinary practices includes numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of NYPD and Brooklyn prosecutors to comply with that rule; and judicial decisions putting the City on notice it could be held liable for its failure to adequately train, supervise, or discipline prosecutors regarding their *Brady* and related due process obligations, including their obligations not to abuse judicial process, coerce witnesses, or use false testimony or argument.  *See, e.g.*, *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992); *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692-96 (1st Dep't. 2001), *Leka v. City of New York*, No. 04 CV 8784 (DAB), 2006 WL 281621 (S.D.N.Y. Sept. 29, 2006),

and *Zahrey v. City of New York*, No. 98 Civ. 4546 (DCP), 2009 WL 54495 (S.D.N.Y. Jan. 27, 2009).

193.    Despite this knowledge, the supervisory and policymaking officers and officials of the Defendant City, including the NYPD and KCDA, perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, practices, and customs; did not effectively instruct, train, or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority; had no employee handbook or other published practices, policies, or procedures for investigating and disciplining prosecutors who had engaged in *Brady* violations and related constitutional violations, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead tolerated the policies, procedures, regulations, practices, and customs, described above, with deliberate indifference to the effect their actions would have upon the constitutional rights of individuals and citizens of the City and State of New York.

194.    The aforesaid policies, practices, and customs of the City of New York were collectively and individually a substantial factor in bringing about the aforesaid violations of Mr. Williams's rights under the Constitution and laws of the United States, and in causing his wrongful conviction and resulting damages.

195.    NYPD officers, KCDA prosecutors, and the supervisors and policymakers in those offices were deliberately indifferent to the manner in which convictions were secured without regard to defendants' constitutional rights or guilt. The violations of defendants' rights were endemic and the City of New York was aware of these practices, but did not take corrective or preventative action to correct it.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Shawn Williams demands judgment against the above-captioned Defendants as follows:

    a)    For compensatory damages to be determined at trial;

    b)    For punitive damages against the individual Defendants in an amount to be determined at trial;

    c)    For reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988 and other applicable laws;

    d)    For pre- and post-judgment interest as allowed by law; and

    e)    For such other relief as this Court deems just and proper.

Dated:          May 26, 2020
                New York, New York

*/s/ Samuel P. Hershey*

WHITE & CASE LLP                      DAVID B. SHANIES LAW OFFICE LLC
Samuel P. Hershey                     David B. Shanies
1221 Avenue of the Americas           Joel A. Wertheimer
New York, New York 10020411           Lafayette Street, Sixth Floor
(212) 819-8200                        New York, New York 10003
                                      (212) 951-1710


Kevin M. Bolan
(*pro hac vice* application to be filed)
75 State Street
Boston, Massachusetts 02109
(617) 979-9300